## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:19-cr-10080-NMG |
| Plaintiff, | |
| vs. | |
| DAVID SIDOO, GREGORY COLBURN, and AMY COLBURN | |
| Defendant. | |

## AMY AND GREGORY COLBURN'S JOINT MOTION TO DISMISS SECOND SUPERSEDING INDICTMENT

Defendants Amy Colburn and Gregory Colburn ("the Colburns") respectfully move this Court to dismiss the Second Superseding Indictment (ECF No. 314) (the "Indictment") pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B) on the ground it fails to state an offense.

## I.   INTRODUCTION

The courts have repeatedly warned of the "inherent danger in a multi-defendant conspiracy prosecution – that individuals who are not actually members of the group will be swept into the conspiratorial net."  Because prosecutors possess broad prosecutorial discretion to prove a conspiracy, the concern is that "those who associate with conspirators will be found guilty of a crime that they have not intended to commit, and part of a group that they never joined."  *United States v. Chandler,* 388 F.3d 796, 798 (11th Cir. 2004), citing *Dennis v. United States,* 384 U.S. 855, 860 (1966).

This danger increases exponentially when prosecutors rely on vague statutory terms, such as "honest services," but ignore clearly expressed statutory requirements, in pursuing conspiracy prosecutions.  Vague criminal laws improperly enable Congress to "set a net large enough to

1

catch all possible offenders, [while leaving] it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *See Skilling v. United States,* 561 U.S. 358, 425 (2010) ("*Skilling*") (Scalia, J. concurring), quoting *United States v. Reese,* 92 U.S. 214,  221 (1876); *see also Sessions v. Dimaya,* 138 S. Ct. 1204, 1212 (2018) (the prohibition against vagueness not only affords defendants due process of the law but also "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries and judges").

The allegations against the Colburns in the Indictment (even assuming they are true for purposes of this motion) are textbook examples of the prosecution (1) "casting the net" too broadly by improperly employing a "rimless conspiracy" to ensnare the Colburns, (2) ignoring fundamental requirements of the crimes on which the conspiracy is based, and (3) misconstruing a vague requirement, honest services, to charge the Colburns with two felonies – violations of 18 U.S.C. Sections 1349 (mail and wire fraud conspiracy) and 1956(h) (money laundering).

More specifically, for the reasons explained in detail below, the Court should dismiss the Indictment against the Colburns, because it:

1.  Does *not* allege sufficient facts or legal grounds to treat the Colburns as members of a single conspiracy that includes all of the other alleged co-conspirators;

2.  Does *not* allege sufficient facts or legal grounds to support money or property mail fraud or wire fraud under 18 U.S.C. Sections 1341 or 1343;

3.  Does *not* allege sufficient facts or legal grounds to support honest services wire or mail fraud under 18 U.S.C. Section 1346; and

4.  Does *not* therefore provide the predicate acts to support either a mail or wire fraud conspiracy under 18 U.S.C. Section 1349 or a money laundering conspiracy under 18 U.S.C. Section 1956(h).

II.     **THE ALLEGATIONS IN THE INDICTMENT**

A.     **The Alleged Facts Concerning the Conspiracy**

The United States alleges that 19 parents are part of a single "fraud conspiracy" in which they used "bribery and other forms of fraud to facilitate their children's admission to selective colleges and universities."  Indictment, ¶ 60.[1]  The United States does not allege that the parents knew of each other or had any interest in each other's children.  According to the Indictment, the parents each live in different cities and engaged in different fraudulent schemes.  Their activities were often separated by years.  The only thing the defendant parents have in common is their common relationship with William "Rick" Singer, who the government alleges was at the center of the conspiracy.

In 2007, Singer founded and began operating Edge College & Career Network, LLC, also known as "The Key," a for-profit college counseling and preparation business.  In or about 2012, he founded the Key Worldwide Foundation ("KWF"), a non-profit corporation, which the Internal Revenue Service ("IRS") approved as a tax exempt organization in 2013.  Individuals who contributed to KWF could deduct those contributions from their taxable income.  ¶¶ 24–25.

Singer and his associates arranged a series of schemes to improve the admissions chances for certain children.  Some of the alleged schemes include:

- In 2011, Singer obtained a falsified identification card so that  Mark Riddell, a college entrance exam coach, could take the SAT in the place of a student in Vancouver. ¶¶ 65–69.

- In 2012, Singer facilitated a bribe to a coach at Georgetown University to designate a student as a tennis recruit who did not play tennis on behalf of a family from Las Vegas.  ¶¶ 203–208.

- In 2013, a parent in Massachusetts engaged Singer to bribe an official at the University of Southern California ("USC") to designate his son as a water polo

---

[1] Hereinafter, all citations to a paragraph number refer to the Indictment.

recruit.  ¶¶ 240–247; and

- In 2018, a parent in Miami had Singer bribe an official at USC to designate his daughter as a crew recruit so that her transfer application would be approved.  The parent also directed a Singer associate to take a biology and an art history class for his daughter.  ¶¶ 262–268.

Alongside these disparate incidents, the government also alleges that, in 2018, the Colburns, of Palo Alto, California, paid Singer to have Riddell review and correct their son's completed SAT exam without obtaining "too high a score" so that "the child would not be alerted to the cheating on his behalf."  ¶¶ 90–93.

The United States asserts that each of these parents (and the 13 other parents indicted with them) was a part of a single conspiracy and, thus, engaged  in acts in furtherance of the fraud conspiracy from in or about 2011 through February 2019.  ¶ 63.  The United States also claims they conspired with one another and with other known and unknown parties to conceal their fraud "scheme" by funneling bribes and other payments through "the façade of The Key or KWF, including via payments to and from accounts in the District of Massachusetts."  ¶ 271.

These allegations give rise to Count One of the complaint – Conspiracy to Commit Mail and Wire Fraud and Honest Services Mail and Wire Fraud, 18 U.S.C. § 1349, and Count Two – Money Laundering Conspiracy, 18 U.S.C § 1956(h).

B.     **The Alleged Facts Regarding the Colburns.**[2]

In the Fall of 2017, the Colburns "agreed with Singer to pay $25,000[3] to have Riddell pose as a proctor for their son's SAT exam and secretly correct his answers."  ¶¶ 2, 3, and 87. After the College Board granted the Colburns' son extended time to take the SAT, Singer e-

---

[2]  The Colburns dispute the allegations in the Indictment, but understand that for purposes of ruling on this motion to dismiss, the Court must accept them as true.

[3] That the Colburns stand to be prejudiced by a joint trial is apparent from the magnitude of the funds at issue for each defendant family.  While the Colburns are alleged to have paid $25,000, the Indictment alleges the other families paid $1.72 million, $650,000, $550,000, $525,000, $500,000, $300,000, $300,000, $250,000, $200,000 (plus an undisclosed sum), $150,000, and $75,000 to Singer for variety of schemes for one or more of their children.

mailed Ms. Colburn a ticket for the Colburns' son to take the SAT exam on March 10, 2018.  On February 1, 2018, Singer arranged to change the testing location from the son's high school to a school in West Hollywood, California (the "West Hollywood Test Center.")  ¶¶ 88–89.  On March 9, 2018, Riddell flew from Tampa to Los Angeles "to purport to proctor the SAT for the Colburns' son and another student who took the test at the West Hollywood Test Center that same day."  ¶ 90.  On some unspecified date, Singer directed Riddell "not to obtain too high a score on the Colburns' son's SAT, so that the child would not be alerted to the cheating on his behalf."  After "the students had completed the exam, Riddell reviewed and corrected their answers."  Riddell earned a score of 1190 out of a possible 1600 for the Colburns' son.  ¶¶ 91–92.

Igor Dvorskiy, the "compensated standardized test administrator" who allowed Riddell to proctor the exam in his place, sent the completed SAT exam to the College Board in New Jersey.  On March 14, 2018, Singer caused KWF to issue a payment of $20,000 to Dvorskiy for "facilitating Riddell's cheating on behalf of the Colburns' son and another student."  On March 23, 2018, "Singer caused KWF to issue a payment of $20,000 to Riddell for correcting the SAT answers for the Colburns' son and the other student who took the exam that same day."  Sometime in 2018, the SAT score from this day was submitted as part of his applications to various colleges.[4]  ¶¶ 35, 94–97.

In or about December 29, 2017, Mr. Colburn initiated a transfer of stock to KWF, Singer's charity, with a value of $24,443.50, "in exchange for Singer's facilitation of the SAT cheating scheme on behalf of his son."  Mr. Colburn issued a check in the amount of $547.45 to

---

[4] The previous indictment, filed on March 26, 2019 (ECF 119), alleged at paragraph 68 that the Colburns' son applied to Texas Christian University, Indiana University, the University of Oregon, and the University of Arizona, none of which is located in the District of Massachusetts or is alleged to be implicated in the schemes of any other parent.

KWF, which he described on the check as "charitable donation."  KWF issued a letter to Mr.

Colburn on December 29, 2017 "falsely indicating that 'no goods or services were exchanged'

for this purported donation of $25,000."  ¶¶ 276–78.

On or about October 24, 2018,  Singer called the Colburns from DOJ's Boston office to

tell them that he told the IRS that their payment "went to our foundation to help underserved

kids."  ¶ 279.[5]

## III.   STANDARD OF REVIEW

The Indictment must be dismissed because it fails to state an offense against either Mr. or

Mrs. Colburn and the motion can be determined without a trial on the merits under Rule

12(b)(3)(B)(v).  Under such circumstances, this Court is authorized to entertain this motion at

this time.  *United States v. Rodriguez-Rivera,* __ F. 3d __ (1st Cir. 2019), 2019 U.S. App. LEXIS

7121, *5.

A motion to dismiss counts of an indictment tests the sufficiency of those counts to

charge an offense.  *United States v. Sampson,* 371 U.S. 75, 79 (1962).  Such a motion will be

granted if the allegations set forth in the indictment are inadequate to permit a jury to find that

the alleged crime occurred.  *United States v. Cowhig,* 2004 U.S. Dist. LEXIS 26469 (D. Mass.,

Oct. 8, 2004).

## IV.   ARGUMENT

### A.   The Indictment Does Not Sufficiently Allege that the Colburns Are Part of a Single Conspiracy that Includes Other Parents and Coaches.

The United States contends that the Colburns are members of a *single* conspiracy that

includes 18 other parents (and other persons, including college coaches) in violation of both 18

---

[5]  Singer began cooperating with the government's investigation in or about late September 2018, according to footnote 1 of the affidavit attached to the complaint filed against the Colburns on March 12, 2019, case no. 3:19-mj-70373-JCS, ECF No. 1-1, page 7 of 101.  Thus, at the time Singer made the October 24, 2018 call to the Coburns he was cooperating with the Government.

U.S.C. Sections 1349 and 1956(h).  While the Government's strategy of lumping together all of the parents into a single conspiracy has had the intended effect of creating widespread public outrage against all of the parents regardless of their actual conduct, there is no legal basis for including the Colburns in this single conspiracy under the allegations in the Indictment.  The Government's improper charging  tactic not only lacks a legal basis, it also creates separate joinder and venue issues, which also must be addressed soon.

As pleaded in the Indictment, the alleged single conspiracy constitutes a "rimless hub and spokes" conspiracy where Singer and his associates are the "hub" of the wheel, and the parents, including the Colburns, are the "spokes."  Such allegations cannot establish a single conspiracy when there is no "rim of the wheel to enclose the spokes."  *Kotteakos v. United States,* 328 U.S. 750 (1946).  Several parents are accused of *independently* engaging Singer in a variety of schemes to increase the possibility that their children would be admitted to various universities.  However, a single conspiracy requires "interdependence among participants." *United States v. Pappathanasi,* 355 F. Supp. 2d 289, 296-97 (D. Mass. 2005).  To be interdependent, "activities of one aspect of the scheme must be necessary or advantageous to the success of another aspect of the scheme."  *Id.* (internal citations omitted).

It is apparent on the face of the Indictment that the allegations regarding each of the parents cannot establish the necessary interdependence.  Each parent was concerned with only their own child.  The "success of one" family in securing admission for their child "did not depend on the efforts of any others," and the United States does not allege that the parents thought that it did.  *Id.* Further, the methods of the alleged scheme varied widely – from having a proctor secretly change answers on an exam to bribing a college coach to falsely designate a student as an athlete.  There are no allegations that the parents knew of the schemes in which they were not participants, which were often separated by years and occurred across the country.

There is simply no reasonable basis for a jury to conclude that the Colburns had any interest in whether other people's kids got into college.

To charge the parents in a single conspiracy, the United States must ignore a well-established body of law.  The Supreme Court's important and oft-cited decision in *Kotteakos* and its progeny continue to be controlling regarding whether the circumstances of a fraud case give rise to a single conspiracy involving multiple persons or a group of separate conspiracies involving separate persons whose trials should not be joined as one.  In *Kotteakos*, the "common and key figure," Simon Brown, pleaded guilty to fraud for obtaining and "brokering" loans under the National Housing Act for individuals knowing that the proceeds of the loans were to be used for purposes other than those falsely stated in the loan applications.  As with the central and key figure here, Singer, Brown essentially created a "side door" for fraudulently obtaining loans under the National Housing Act.  *Id.* at 753.

In *Kotteakos,* the United States indicted thirty-two defendants as members of a single conspiracy who used Brown to induce various financial institutions to grant credit to each of them with the intent that the loans would then be offered to the Federal Housing Administration for insurance based on applications containing false and fraudulent information.  Of the thirty-two defendants, nineteen were brought to trial and the names of thirteen were submitted to the jury; two were acquitted; the jury disagreed as to four; and the remaining seven were found guilty.  *Id.*at 752–53.

In discussing whether the convicted defendants were unduly prejudiced by having their cases heard in a single trial, the Supreme Court recounted that the proof at trial actually made out a case, "not of a single conspiracy, but of several, notwithstanding only one was charged in the indictment."  *Id.* at 755.  In fact, the Court referred to the Court of Appeals having concluded in that case that there "were at least eight, and perhaps more, separate and independent groups,

none of which had any connection with any other, though all dealt independently with Brown as their agent." *Id.* at 754. The Government, itself, characterized the circumstances as "that of separate spokes meeting in a common center," though the Supreme Court added the important phrase – "without the rim to enclose the spokes." *Id.* at 755.

The Supreme Court also referred to the Court of Appeals having made the analogy to thieves using a single "fence" to dispose of their loot. In doing so, the thieves do not become "confederates" allowing that they might but "it takes more than knowledge that he is a 'fence' to make them such." In fact, the Court of Appeals stated that the trial judge was *plainly wrong about the existence of a single conspiracy* and "should have dismissed the indictment." *Id.* at 755 (emphasis added).

In concluding that combining the trial of all of the defendants when there were at least eight different conspiracies was prejudicial error, the Supreme Court made several statements that resonate here, including that the number of defendants in a criminal trial is "vitally important, especially in criminal matters" noting that "[g]uilt with us remains individual and personal, even as respects conspiracies." *Id.* at 772. The Court added that guilt "is not a matter of mass application," allowing that while there are times when of necessity, because of the nature and scope of the particular federation, large numbers of persons taking part must be tried together or perhaps not at all, at any rate as respects some," because when "they conspire they invite mass trial by their conduct." However, the Court characterized such proceedings as "exceptional to our tradition." *Id.* at 773. Indeed, in discussing the defendants in *Kotteakos,* the Court cautioned that:

> Criminal they may be, but it is not the criminality of mass conspiracy. They do not invite mass trial by their conduct. Nor does our system tolerate it. That way lies the drift toward totalitarian institutions. True, this may be inconvenient for the prosecution. But our Government is not one of mere convenience

> or efficiency.  It too has a stake, with every citizen, in his being
> afforded our historic individual protections, including those
> surrounding criminal trials.  About them we dare not become
> careless or complacent when that fashion has become rampant over
> the earth.

*Id*.

The Supreme Court found that "toleration for a single trial went too far" in *Kotteakos,*

holding that the Government was prohibited from "string[ing] together, for common trial, eight

or more separate and distinct crimes, conspiracies related in kind though they might be, when the

only nexus among them lies in the fact that one man participated in all."  *Id*.  The "dangers of

transference of guilt from one to another across the line separating conspiracies, subconsciously

or otherwise, are so great that no one really can say prejudice to substantial right has not taken

place."  *Id*. at 773-74.

The circumstances of the present Indictment present the precise problems addressed so

eloquently by the Supreme Court in *Kotteakos.*  Here, as there, one central figure, Singer, is key

to each of the separate conspiracies.  However, the parents' circumstances are each unique and

personal, and their alleged schemes are not interdependent.  Thus, rather than being a member of

a single mass conspiracy, the allegations establish at most that the Colburns are members of a

much smaller separate conspiracy.

The federal courts have continued to warn against the harm caused by multi-defendant

conspiracy prosecutions.  In *United States v. Chandler, supra,* the United States pursued a

superseding indictment charging various defendants with being a part of a single mail fraud

conspiracy, because they had claimed they were legitimate winners of McDonald's promotional

game stamps when they had obtained them from a McDonald's employee who had embezzled

them from his employer.  The embezzler was thus the "hub" of a conspiracy when he constructed

a network of persons who would both redeem the game stamps and recruit others to do so.

These latter persons became the "spokes" of the conspiracy.  However, because the Government failed to prove any connection between each of the "spokes" and only a connection between the "spokes" and the "hub," the single conspiracy was deemed a "rimless wheel" and therefore not actionable.  The Court concluded that "where the 'spokes' of a conspiracy have no knowledge of or connection with any other, dealing independently with the hub conspirator, there is no single conspiracy, but rather as many conspiracies as there are spokes."  *Id.* 388 F.3d at 807.  *See also, e.g., Pappathanasi,* 355 F. Supp. 2d at 296-97 (D. Mass. 2005) (granting a judgment of acquittal because the Government had charged a wheel-and-spokes tax fraud conspiracy but the court found instead that there were multiple conspiracies because the success of one conspiracy did not affect the success of others); *Am. Sales Co., LLC v. AstraZeneca LP (In re Nexium (Esomeprazole) Antitrust Litig.),* 842 F.3d 34, 56-57 (1st Cir. 2016) ("[W]ithout proving the existence of a 'rim' to the wheel in the form of an agreement among the generic manufacturers, the plaintiffs did not have a viable claim of overarching conspiracy…"); *United States v. Dworken*, 855 F.2d 12, 23-24 (1st Cir. 1988) (proof of a hub and spoke conspiracy "without the rim of the wheel to enclose the spokes" does not establish a single conspiracy); *United States v. Baldridge,* 559 F.3d 1126, 1136 (10th Cir. 2009) ("[A] single conspiracy does not exist solely because many individuals deal with a common central player..") (emphasis added; internal citations omitted).[6]

As pleaded in the Indictment, the Colburns are one of many spokes who dealt with the

---

[6] This case is distinguishable from drug cases, such as *United States v. Portela*, 167 F.3d 687 (1st Cir. 1999).  In a conspiracy to traffic or sell drugs, though defendants may not know all of the persons in the conspiracy, they rely on them to accomplish their criminal task of distributing drugs.  As the First Circuit has stated, their "known interdependence…makes it reasonable to speak of a tacit understanding between the distributor and others upon whose unlawful acts the distributor knows his own success likely depends."  *Id.* at 695 (internal citations omitted).  In other words, those cases establish the interdependence that cannot be established, here.

Further, here, the underlying transaction – engaging a college counselor – is generally lawful.  "Because the underlying transaction is generally lawful, one cannot infer an illegal common purpose in the same way that a common purpose could be found in a drug conspiracy.  Instead, interdependence must be proved more precisely." *United States v. Carnagie*, 533 F.3d 1231, 1239, fn. 5. (10th Cir. 2008).

hub conspirator, Singer.  However, the United States fails to allege sufficiently that the Colburns had any knowledge about the dealings of the other "spokes" (parents) with Singer or were in any way interdependent with the other parents.  To allege a single conspiracy, the United States must allege "a shared, single criminal objective, not just similar or parallel objectives between similarly situated people."  *Id.*  The United States has not done that here.  Thus, the Indictment is deficient, because it does not support a single conspiracy involving other alleged conspirators in addition to Singer and his cohorts.  And, this conclusion applies both to the mail/wire fraud conspiracy and the money laundering conspiracy, which relies on the former as its predicate.

> ### B.    The Indictment Does Not Sufficiently Allege a Conspiracy Based on Money or Property Mail Fraud or Wire Fraud Under 18 U.S.C. §§ 1341 or 1343.

As discussed above, the United States accuses the Colburns of conspiring to commit mail fraud and wire fraud and honest services mail and wire fraud by participating in an SAT cheating scheme with Singer, Riddell, and Dvorskiy in 2017–18.  The United States contends that the Colburns did so to obtain a higher SAT test score for their son.  To accomplish this goal, the United States alleges that the Colburns paid Singer to arrange with Dvorskiy, "a compensated standardized test administrator," to let Riddell proctor their son's March 10, 2018 SAT so he could change some of their son's answers resulting in their son obtaining a score of 1190 out a possible total score of 1600.

As the First Circuit explained in *United States v. Berroa,* 856 F.3d 141 (1st Cir. 2017), there are two separate and distinct types of mail and wire fraud:  (1) money or property mail or wire fraud (18 U.S.C. §§ 1341 and 1343), and (2) honest services mail or wire fraud (18 U.S.C. § 1346).  Money or property mail or wire fraud requires the government to prove a loss of money or tangible (physical) property.  Honest services mail or wire fraud requires the government to prove a loss of the "intangible right of honest services."  *Id.* at 148-49.

*Berroa* involved a standardized test cheating scandal in Puerto Rico.  However, the test at issue in *Berroa* was the exam required for applicants to obtain a government-issued medical license, which exam was administered by the Territory of Puerto Rico.  The defendants bribed an employee of the Puerto Rico Medical Board to create fraudulent score results.  Thus, previously unsuccessful applicants were able to become licensed as medical doctors in Puerto Rico.  The five defendants in that matter were indicted for conspiracy to commit honest-services mail fraud, money or property mail fraud, and aggravated identity theft.  A jury convicted some of the defendants of mail fraud and honest-services mail fraud.  *Id.* at 147-48.

The Court of Appeals reversed the mail fraud convictions on the grounds that the medical licenses did not qualify as "property" under Section 1341.  In doing so, the Court relied on the Supreme Court's decision in *Cleveland v. United States,* 531 U.S. 12, 20-24 (2000), a case in which the defendants were alleged to have made false statements in applications for state gaming licenses.  The Supreme Court concluded that the government's theory of prosecution "stray[ed] from traditional concepts of property" and also pointed out that the government's reading of Section 1341 would result in a "sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress."  531 U.S. at 24.

To try to avoid the result in *Cleveland,* the Government in *Berroa* asserted that the defendant's "use of" their licenses would fraudulently deprive patients and others of payment for services and prescriptions.  The First Circuit rejected this strategy as an impermissible "usurpation of state criminal jurisdiction."  *Berroa,* 856 F.3d at 150.

While the instant case does not involve allegations of cheating to obtain a *state* license, the courts' reasoning in *Cleveland* and *Berroa* applies with equal force.  Here, the United States alleges that the ACT and SAT tests and the test scores are "the intellectual and physical property of ACT, Inc. and the College Board, respectively."  ¶ 56.

Intellectual property rights are *intangible* rights, and, thus, do not constitute the type of "physical" property required to prove a violation of Sections 1341 and 1343.  Similarly, if the test scores, themselves, constitute property, they must be considered to be intangible property rather than physical, tangible property.  Indeed, the scores are typically stored and communicated electronically.  And, any alleged value associated with the paper exam booklets is necessarily the result of their intellectual property value, as opposed to the value of the underlying paper.[7]

The United States might rely on an out-of-circuit decision, *United States v. Al Hedaithy*, 392 F.3d 580 (3d Cir. 2004) ("*Al Hedaithy*"), to try to distinguish the favorable holdings in *Cleveland* and *Berroa* from the instant case.  In *Al Hedaithy*, the defendants were charged with violating Section 1341, mail fraud, for cheating on a standardized exam known as the "Test of English as a Foreign Language" ("TOEFL") by sending impostors to take their exams.  The test is "owned" and administered by the Educational Testing Services ("ETS").  In superseding indictments, the United States attempted to describe ETS' "property interest" in the TOEFL in greater detail, because a federal court had dismissed a similarly worded indictment in another case holding that the integrity of the testing process was *not* a physical property interest .  *Id.* at 392 F.3d at 584.

The defendant Al Hedaithy challenged the sufficiency of the superseding indictment pursuant to Fed. R. Crim. P. 12(b) claiming that it failed to allege conduct that violated the mail fraud statute.  The district court rejected the challenge reasoning that the certificate the defendant had received from ETS for fraudulently passing the TOEFL exam deprived ETS of "goodwill." *Id.* at 585.  The defendant was then convicted of mail fraud and conspiracy to commit mail fraud

---

[7] Moreover, as emphasized in *Cleveland*, California state laws are available to remedy any harm caused by the alleged cheating scheme at issue.  This is especially true for the Colburns, because all of the alleged acts of fraud occurred in California. Nothing other than Singer's government-scripted false statements to the Colburns made in October 2018 occurred outside of California.

under the superseding indictment and was sentenced to one year probation and a $750.00 fine.

Unlike the First Circuit in *Berroa,* the Third Circuit held that ETS' *intangible* property rights were protected by Section 1341.  Thus, the Third Circuit upheld the conviction reasoning that the defendant's exam cheating deprived ETS of confidential business information and similar intangible property.  *Id.* at 392 F.3d at 594-96.  The Court also held that the exam's "score reports" were *tangible* property of the type covered by Section 1341, and it did not matter that the score reports might be of *de minimus* value.  *Id.* at 392 F.3d at 596-601.  In support of its position, the Court again referred to such *intangible* qualities as ETS' reputation, etc.  *See* 392 F.3d at 601 where the Court equates ETS's score reports with the *intangible* reputational harm caused to a school by admitting inept students.

Moreover, the Court in *Al Hedaithy* relied on reasoning of the Sixth Circuit in *United States v. Frost,* 125 F.3d 346, 367 (6th Cir. 1997) in connection with comparing ETS's score reports with unissued diplomas in *Frost.  Al Hedaithy,* 392 F.3d at 601.  The quoted reasoning from *Frost,* however, is taken from the court's discussion of the intangible right to honest services, Section 1346, and not from the *Frost* court's discussion of Section 1341, money or property mail fraud.  Thus, the Sixth Circuit's reasoning was not really applicable.

Additionally, unlike the First Circuit in *Berroa,* the Third Circuit in *Al Hedaithy* did not have the benefit of the Supreme Court's decision in *Skilling v. United States,* 561 U.S. 358 (2010) ("*Skilling*").  In *Skilling,* the Court made it clear that Congress intended Section 1346, and not Section 1341 and/or Section 1343, to be the sole basis for protecting intangible property rights from deprivations.  And, such protection was limited to the intangible right to honest services resulting from bribes or kickbacks *and* a breach of a fiduciary duty.

Thus, the Indictment does not state an offense under Section 1349 for the Colburns conspiring to violate Sections 1341 or 1343, because DOJ does not allege a deprivation of any

money or tangible property resulting from the alleged cheating scheme.

    **C.**    **The Indictment Does Not Sufficiently Allege an Honest Services Fraud Conspiracy Under 18 U.S.C. § 1346.**

Section 1346 states that the term scheme or artifice to defraud includes a scheme or artifice to deprive another of the intangible right of honest services.  In *Skilling*, the Supreme Court saved Section 1346, honest-services fraud, from being declared unconstitutionally vague by holding that Section 1346 criminalizes only the bribe-and-kickback core of the pre-*McNally* case law.  The "vast majority" of the pre-*McNally* honest-services cases involved offenders who, in violation of a *fiduciary* duty, participated in bribery or kickback schemes.  Thus, only if the intangible right of honest services is deprived through a bribe or kickback is there a crime. *Skilling,* 561 U.S. at 407-09.

In a concurring opinion joined by two other Justices, Justice Scalia emphasized the need for some type of clarity on the fiduciary requirement.  He observed that none of the honest services cases defined the nature and content of the *fiduciary duty* required to be breached as an element of the crime.  Indeed, to the extent the cases established a "federal, common-law fiduciary duty; the duty remained hopelessly undefined" noting that some courts have used such expressions as "standards of moral uprightness, fundamental honesty, fair play and right dealing." to explain the intangible rights to be protected.  Therefore, rather than interpreting and limiting honest services in a manner that saved the statute, Justice Scalia and the other concurring judges believed the Court should have invalidated the statute so Congress, rather than the courts, could solve the "most fundamental indeterminacy: the character of the 'fiduciary capacity' to which the bribery and kickback restriction applies."  561 U.S. at 421-24.

The Indictment here is silent regarding the fiduciary duty requirement of the honest services obligation in this case.  Instead, in a one sentence paragraph (¶ 51), the United States

alleges only that "[c]ompensated ACT and SAT administrators owe a duty of honest services to ACT, Inc. and/or the College Board."  It is telling that the United States does not allege that any of the defendants, especially the Colburns, breached or caused anyone to breach any fiduciary duty in light of the holding in *Skilling*.  While such an allegation might not be necessary in an employer-employee relationship or when dealing with a government official given the established case law in this regard, neither situation is alleged to be present here.

Presumably, the United States contends that Singer's payment to Dvorskiy in connection with the use of the West Hollywood Testing Center is a "bribe" that caused Dvorskiy to look the other way when Riddell allegedly changed the Colburns' son's  SAT test scores on March 10, 2018.  And, presumably, the United States contends that such conduct breached Dvorskiy's duty of honest services to the College Board.  Yet, the United States fails to allege the requirement of a fiduciary duty owing by Dvorskiy to the College Board.  Indeed, unlike the situation in *U.S.* v. *Meredith*, 19-cr-10075-MLW at 5, the United States does not allege that Dvorskiy owes the fiduciary duty of an employee to an employer.

In *Berroa*, the fiduciary duty was a non-issue, because the defendants had bribed an employee of the Puerto Rico Medical Board to create fraudulent test scores.  The fact that this person was in an employee-employer relationship with the Medical Board and also a public official/employee made for an obvious fiduciary relationship.  However, where, as here, an employer-employee relationship is not present and a government official is not the beneficiary of the alleged bribe, the fiduciary issue becomes central to any analysis of the honest services obligation.  For example, in *United States v. Milovanovic,* 678 F.3d 713, 717-18 (9th Cir. 2012), the State of Washington had required commercial truck drivers to obtain a special commercial driver's license ("CDL") to operate large vehicles.  An applicant for such a license had to be a resident of Washington with a Washington driver's license, and had to take and pass the CDL

exam, which consisted of both a written and driving test.

The defendant Milovanovic, a bilingual English and Bosnian speaker, was an independent contractor for a language translation company that contracted with government agencies to provide translation services.  As part of a scheme to defraud, Milovanovic contacted Bosnian-speaking persons residing outside the state and offered to provide them a CDL for approximately $2,500.  In addition to translating for such applicants, Milovanovic also routinely helped such applicants cheat on the exam.  Milovanovic also paid other third party contractors to assist in fraudulently obtaining CDLs for his applicants.  *Id.*

The government indicted Milovanovic and five other persons for mail fraud and honest services fraud.  Milovanovic moved to dismiss a superseding indictment, which was granted by the district court, because Milovanovic was an independent contractor who had no agency or employment relationship with the State of Washington.  A divided panel of the Ninth Circuit reversed and remanded the matter for further proceedings.  *Id.* at 719.

After considering the Supreme Court's decision in *Skilling,* the Court confirmed that a breach of fiduciary duty is a required element of honest services fraud under Sections 1341 and 1346.  The Court then considered whether the Supreme Court intended to require a formal or classic fiduciary duty or whether the statute also reaches those who assume a comparable duty of loyalty, trust, or confidence.  The Court agreed that because Milovanovic did not contract directly with the State of Washington, there was "no recognized fiduciary relationship between Milovanovic and the State of Washington."  *Id*. at 721.

However, the Ninth Circuit held that the duty may extend *beyond* a fiduciary or trust relationship with the victim of the fraud and "encompasses informal fiduciaries" such as partnerships, joint ventures, and "other informal relationships."  The Court said the definition is "broad" and should be left to the jury to decide in a criminal prosecution.  The Court then held

that for the purposes of the mail and wire fraud statutes, the required duty extends to one in "a trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise." The Court then left the fiduciary issue for the jury to decide for defendant Milovanovic. *Id.* at 722-24.[8]

Expanding the definition of "fiduciary" beyond its formal legal definition poses the precise risk of vagueness foreseen by Justice Scalia in his concurring opinion in *Skilling*. Such vagueness allows prosecutors, judges, and jurors, rather than Congress, to decide the definition and limits of the fiduciary duty owing to the victim of honest services fraud. And, where, as here, (1) the alleged duties of Dvorskiy, an independent contractor, are imposed by the policies of a private organization, the College Board, (2) such policies determine Dvorskiy's fiduciary responsibilities, and (3) the breach of such duties give rise to the sanctions of the criminal law, Congress must be deemed to have effectively improperly delegated its criminal law making responsibility to a private organization. And, "when it comes to [a legislative delegation to] private entities, however, there is not even a fig leaf of Constitutional justification." *Dep't of Transp. v. Ass'n of Am. R.R.s,* 135 S. Ct. 1225, 1237 (Alito J., concurring).

Given the fact that extending the meaning of "fiduciary" beyond the accepted circumstances of a public official and an employer-employee, poses serious constitutional questions, the Colburns urge this Court to reject the prosecution's attempt to impose liability on the Colburns based on Dvorskiy's alleged violation of standards imposed on him by the College Board. And, as a result, Dvorskiy's alleged wrongdoing does not constitute an actionable violation of any honest-services obligation.

---

[8] The Court further rejected the assertion that in order for the honest services provision to apply there must be some identifiable economic harm caused to the victim. Instead of requiring economic harm in honest services cases, the Court sided with four other circuits (not including the First Circuit) in adopting a materiality requirement. *Id.* at 726-27. But, it did so in the context of harm to the public as opposed to a "private sector" case. The United States has failed to include any materiality or economic harm allegation in the Indictment.

**D.**     **The Indictment Does Not Sufficiently Allege a Money Laundering Conspiracy Under 18 U.S.C. § 1956(h).**

The United States' allegations of money laundering are predicated primarily upon there being sufficient allegations of actionable fraud under the mail and wire fraud statutes discussed above.[9] For example, the Indictment alleges that the money laundering conspiracy was to "conceal [defendants'] fraud scheme by funneling bribe and other payments through the façade of a purported charitable organization, KWF. . . ." Thus, if, as discussed above, the bribe allegations are not actionable based on the allegations in the Indictment, then it follows that the money laundering allegations must also fail.

Moreover, for the same reasons the Indictment allegations do not sufficiently support the charge of a single conspiracy against the Colburns, including other parents, under 18 U.S.C. Section 1346, they also fail to support a charge of a single conspiracy under 18 U.S.C. Section 1956(h).

**V.**     **CONCLUSION**

Based on the foregoing, the Court is respectfully requested to grant this motion to dismiss the Superseding Indictment against the Colburn Defendants.

> Respectfully submitted,
>
> AMY COLBURN AND GREGORY COLBURN
>
> By their attorneys,
>
> *David S. Schumacher*
> David S. Schumacher (BBO #647917)
> HOOPER, LUNDY & BOOKMAN, P.C.
> 470 Atlantic Avenue, Suite 1201
> Boston, MA 02210
> (617) 532-2700
> (617) 345-3927 (fax)

---

[9] In *Skilling,* the Court mentioned the fact that RICO and money laundering crimes are predicated upon honest services fraud, 18 U.S.C. § 1346.  561 U.S. at 410-11.

dschumacher@health-law.com
Patric Hooper (*Pro Hac Vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517
(310) 551-8111
(310) 551-8181 (fax)
phooper@health-law.com

Jordan Kearney (*Pro Hac Vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
575 Market Street, Suite 2300
San Francisco, CA 94105
(415) 875-8500
(415) 875-8519 (fax)
jkearney@health-law.com

DATED: April 15, 2019

## Certificate of Service

I, David S. Schumacher, counsel for Amy Colburn and Gregory Colburn, hereby certify

that this document filed through the CM/ECF system will be sent electronically to the registered

participants as identified on the NEF (NEF) and paper copies will be sent to those indicated as

non-registered participants on April 15, 2019.

*David S. Schumacher*
David S. Schumacher

## L.R. 7.1(a)(2) and 37.1(b) Certification

I, David S. Schumacher, counsel for Amy Colburn and Gregory Colburn, hereby certify

that I conferred with opposing counsel in a reasonable and good faith effort to reach agreement

or narrow the areas of disagreement to the greatest possible extent on the matters set forth in the

motion, but the parties failed to reach agreement.

*David S. Schumacher*
David S. Schumacher