UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| UNITED STATES OF AMERICA | ) |  |
|---|---|---|
|  | ) |  |
| v. | ) | Criminal No.: 19-10080-NMG |
|  | ) |  |
| GREGORY COLBURN, | ) |  |
| AMY COLBURN, | ) |  |
|  | ) |  |
| Defendants | ) |  |

## GOVERNMENT'S SENTENCING MEMORANDUM

The government submits this memorandum in connection with the sentencing of defendants Gregory and Amy Colburn. The parties have entered into plea agreements pursuant to Fed. R. Crim. P. 11(c)(1)(C) providing for the following agreed-upon disposition for each defendant: eight weeks of incarceration; 12 months of supervised release, including 100 hours of community service; and a $12,500 fine.

The highly-educated, multi-millionaire defendants lied to arrange for cheating on their son's SAT exam, lied on their taxes about the bribe payments which funded that cheating, and then agreed to lie to cover-up their fraud and bribery. The proposed eight-week term of incarceration for these defendants, who pled guilty shortly before standing trial, is equal to the longest sentence to date for any defendant who engaged in the test-cheating scheme once. For the reasons set forth below, the government respectfully recommends that the Court accept the defendants' guilty pleas and impose the agreed-upon dispositions.

**I.     THE OFFENSE CONDUCT**

The Court is by now familiar with the facts of this case. *See generally* PSR ¶¶ 23–59. The defendants Gregory and Amy Colburn—wealthy graduates of Harvard University and UCLA Medical school, and UC Berkeley, respectively—conspired with William "Rick" Singer and others

to commit mail fraud, wire fraud, and honest services mail and wire fraud by agreeing to cheat on their son's SAT exam. *Id.* ¶¶ 41, 67. As part of the scheme, the defendants made payments totaling $25,000, styled as fake "donations," to Singer's sham charity, the Key Worldwide Foundation ("KWF"), in exchange for Singer to bribe Igor Dvorskiy, a standardized test administrator, to allow Mark Riddell to purport to proctor their son's SAT exam and then to secretly correct his answers. *Id.* ¶¶ 41–59. The defendants lied about those payments on their taxes, and then readily agreed to lie to cover-up their crimes. *Id.* ¶¶ 46, 58.

### A. The Defendants' Lies to Move Their Son's SAT to West Hollywood

In September 2017, Amy Colburn began following Singer's directions to request accommodations for her son's SAT exam. *Id.* ¶ 43. Although the defendants' son was legitimately entitled to extended time, the Colburns sought approval for him to take the exam over multiple days so that they could move the testing location from where they lived in Silicon Valley to Singer's corrupt testing site in Los Angeles. *Id.* Amy Colburn told her son's high school education specialist that her son would "NOT" be taking the PSAT because Singer "did not want him to have a public score yet." *Id.* Singer and test-cheating co-conspirators used this tactic, as the Court is now familiar, to avoid detection of the cheating because a large jump in score from the PSAT to the SAT would raise red flags with the College Board. *Id.* In November 2017, the defendants' son was approved for the requested accommodations, with Amy Colburn e-mailing Singer that they "got the accommodations we wanted for the SAT." *Id.*

A month later, Singer notified the defendants that he had moved their son's SAT exam from Palo Alto, California to Singer's corrupt West Hollywood test center. *Id.* ¶ 48. Even though her son was scheduled to take the SAT over two days consistent with his accommodations, Amy Colburn made a one-night hotel reservation in Los Angeles for the night before the exam. *Id.* This

2

was consistent with the plan to cheat: the only reason the defendants sought multiple days for their son's test was so that the testing location could be changed to the test center that Singer "controlled." *Id.*

Later, teachers at their son's high school e-mailed the defendants to confirm the school's understanding that their son was scheduled to take his SAT with full accommodations at his local high school in Palo Alto. *Id.* ¶ 49. After the defendants conferred, Amy Colburn responded by lying, telling the school that they arranged for their son to take the exam in Los Angeles because "we were going to be down there." *Id.* ¶¶ 49–50. In reality, and as cell-site GPS location data confirms, the sole purpose of the defendants' 350-mile trip from the Bay Area to Los Angeles for 24 hours was to cheat on their son's SAT.[1]

On the same day that Amy Colburn lied to her son's high school about the reasons for travelling to Los Angeles, she e-mailed Singer, telling him "we're all set to fly to Los Angeles" and asking whether she needed to pack her son a lunch for the exam. *Id.* ¶ 51. Singer replied that it "will be a relaxed environment" and that the defendants' son—who was scheduled to take the exam over two days in accordance with his legitimate accommodations—would be finished by the early afternoon on the *first* day of testing. *Id.*

---

[1] The government was prepared to introduce at trial the testimony of an agent from the FBI's Cellular Analysis Survey Team ("CAST") and marked as a trial exhibit his report, based on the GPS location data of the defendants' cell phones, showing that the defendants traveled directly from the Burbank Airport in West Hollywood on the night of March 9, 2018 to their hotel in West Hollywood, and did not leave the area immediately surrounding their hotel in West Hollywood until they departed Los Angeles on the evening of March 10, 2018, after the exam. The government is prepared to submit this report to the Court if the defendants—as they have in the past—contend that they traveled to Los Angeles for reasons other than to cheat.

3

### B. The Defendants' Bribe Payments for the Cheating and the Lies on Their Taxes

In December 2017, Gregory Colburn transferred approximately $24,400 worth of stock from his brokerage account to KWF. *Id.* ¶ 44. He falsely told his stock broker that the purpose of the transaction was a "charitable contribution." *Id.* Shortly before making that payment, Gregory Colburn left Singer a voicemail asking if "this"—the money—was for the SAT exam or the ACT exam. *Id.* About a week later, he gave Singer a check, payable to KWF, for $547.45, the difference between the defendants' stock payment and Singer's $25,000 price for the cheating scheme. *Id.* ¶ 45.

In return, Singer gave the defendants a fake charitable receipt letter from KWF, falsely stating that their bribe payment to fund the cheating was for "educational and self-enrichment programs to disadvantaged youth," and that "no goods or services were exchanged." *Id.* ¶ 46. The defendants provided this fraudulent letter to their tax preparer, and they lied on their taxes by falsely deducting the bribe payments as phony charitable contributions. *Id.* In the previous three years combined, the defendants donated $1,521 to charity, 6% of the amount they paid to cheat on their son's SAT exam. *Id.*

### C. The Defendants' Trip to Los Angeles to Complete the Cheating

On March 9, 2018, Amy Colburn, Gregory Colburn, and their son flew from San Jose to Burbank Airport in Hollywood. *Id.* ¶ 52. On the same day, the corrupt test proctor Riddell flew from Florida to Los Angeles. *Id.*

The following day, the defendants' son took the SAT at the West Hollywood test center. *Id.* ¶ 53. In exchange for $20,000 from Singer, Dvorskiy violated his duty of honest services to the College Board by allowing Riddell to purport to proctor the SAT for the defendants' son (and one other student). *Id.* ¶¶ 53, 56. Also in exchange for $20,000 from Singer, Riddell changed the

answers for the defendants' son (and one other student) after he completed the exam, earning him a fraudulently inflated score. *Id.*

The defendants' son did not use the two days allotted for the exam. *Id.* Instead, the defendants and their son flew home on the night of March 10 to complete the 24-hour trip. *Id.* Dvorskiy mailed the completed exam to the College Board, which issued the defendants' son a score and score report that he used to apply to various colleges in the fall of 2018. *Id.* ¶¶ 55, 57

D.      **The Lies to Cover-up the Defendants' Cheating, Fraud, and Bribery**

In October 2018, after he was approached by law enforcement, Singer made a consensually recorded call from Boston to the defendants. *Id.* ¶ 58. As a ruse, Singer told the defendants that KWF was being audited, and "of course, I'm not going to mention to the IRS that Mark [Riddell] took the test for [your son]." *Id.* During the call, both Amy and Gregory Colburn acknowledged the cheating and the $25,000 fake donation. *Id.* In response to Singer telling the defendants that he wanted to make sure "our stories are aligned" about the $25,000 bribe payment, Gregory Colburn said, "Right. It was to help underserved kids. Got it. No problem." *Id.*

A month later, Amy Colburn was captured discussing the cheating during another consensually recorded call with Singer. *Id.* ¶ 59. In response to Singer colloquially referring to the cheating as "we had Mark take [the test]" for the defendants' son, Amy Colburn responded, "But [my son] still took it, right? . . . I mean, he was there?" *Id.* When Singer said that her son was physically present for his own SAT—"Yeah, he was there. Absolutely"—Amy Colburn laughed. *Id.*[2] While awaiting his initial appearance in a holding cell following his arrest, Gregory

---

[2] "To the extent that she laughed during this call," the defendant Amy Colburn writes in her objections to the PSR, "this was a nervous response to an awkward and unusual conversation." Def. Obj. PSR ¶ 59. She "disputes" that she laughed about the cheating. *Id.* If the Court deems it warranted to evaluate the § 3553(a) factors and the defendants' culpability, the government will submit to the Court the audio recordings of the calls between the defendants and Singer.

Colburn admitted to one of his co-defendants that he paid Singer several thousand dollars and "did the testing."

## II. SENTENCING RECOMMENDATION

*"Since the tests are graded on a curve, this cheating scandal not only affects the cheating students, but everyone else's grades in the class. . . . As a parent of a student taking this course, and for all [high-school] students and parents, it is important that the school be seen not only handing out appropriate consequences to those students who cheated, but to be seen making grade reparations to all the honest students who have been adversely affected by this scandal."* See Ex. A. Those are the words of the defendants Amy and Gregory Colburn, when they thought others were watching.

That is what the defendants wrote to teachers at their son's high school in 2015 when they learned that several students in their older son's high school were accused of cheating on calculus tests. Just a few years later, the defendants paid Singer a $25,000 fake donation to bribe two individuals to cheat on their younger son's SAT exam, lied about the payment on their taxes, and then agreed to lie to cover-up their crimes.

The audacity it took for the defendants to publicly accuse *children* of cheating when it disadvantaged their own son, and then privately engage in cheating, fraud, and bribery to benefit their other son, encapsulates the causes of the college admissions scandal and Varsity Blues cases. For an array of reasons—self-aggrandizement, arrogance, and a belief that the rules do not apply to those with wealth and privilege—the defendants knowingly chose to break the law and engage in conduct that they obviously knew was wrong.

The seriousness of the defendants' crimes and their substantial involvement in the scheme justify a meaningful sentence of incarceration. See 18 U.S.C. § 3553(a)(1), (2)(A). While Amy

Colburn was more involved in the day-to-day mechanics of the cheating and Gregory Colburn was more involved in the financial aspects of the fraud, together, they agreed to pay money in exchange for cheating, lied to their son's high school about it, traveled hundreds of miles for the sole purpose of facilitating the cheating, lied on their taxes about the payments, and agreed with Singer to lie to cover-up their fraud and bribery. At every step of the way—over the course of more than a year—the defendants were intimately involved in the details of the fraud and bribery, and they agreed to peddle even more lies to avoid getting caught for cheating.

The defendants' history and characteristics underscore the bewildering nature of their conduct. *See* 18 U.S.C. § 3553(a)(1). Despite privileged upbringings, a net worth totaling millions of dollars, and degrees from three of the most prestigious academic institutions in the country, the defendants chose to break the law by purchasing their son a test score that other students worked hard to achieve on their own merit.

Finally, the agreed-upon dispositions reflect the statutory interest of imposing comparable sentences for similarly-situated defendants, and the government notes that the defendants were among the last to accept responsibility for their crimes, on the near-eve of trial. As examples of other test-cheating sentences:

- Defendant David Sidoo was sentenced to three months in prison after agreeing to pay $200,000 to facilitate exam cheating multiple times on behalf of his two sons. Unlike the defendants, Sidoo engaged in fraud beyond exam cheating—including by providing edits to fraudulent essays for his son's college application and arranging for cheating on a high school exam—and he completed the exam cheating twice. However, unlike the defendants, Sidoo more promptly accepted responsibility for his crimes.

- Defendants Gregg and Marcia Abbott were each sentenced to one month in prison after agreeing to pay $125,000 to facilitate cheating on their daughter's college entrance exams. Unlike the defendants, the Abbotts engaged in Singer's scheme on two occasions. But the Abbotts promptly accepted responsibility for their crimes, agreeing to plead guilty before being indicted or having the opportunity to review discovery. Facing overwhelming evidence of their guilt, the defendants pled guilty on the eve of trial.

7

- Defendant William McGlashan was sentenced to three months in prison after agreeing to pay $50,000 to cheat on his son's ACT exam, and agreeing to participate in the athletic-recruitment aspect of Singer's scheme (before he was tipped off by Singer). Like the defendants, McGlashan conditionally pled guilty and preserved his right to appeal. Unlike the defendants, McGlashan agreed to the side-door aspect of the scheme and also explored engaging in additional exam cheating for his other children.

- Defendant Mark Hauser was sentenced to two months in prison for agreeing to pay $40,000 to cheat on his daughter's ACT exam. Unlike Hauser, the defendants did not agree to refer other clients to Singer. Like Hauser, who disguised his payment as a business consulting fee, the defendants lied about the nature of their payments, deducting them as fake charitable contributions.

Accordingly, the government submits that the proposed dispositions, as a whole, appropriately balance the considerations set forth in Section 3553(a).

### III. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court accept the defendants' Rule 11(c)(1)(C) guilty pleas and impose the agreed-upon sentences: eight weeks of incarceration; 12 months of supervised release, with 100 hours of community service; and a fine of $12,500. The government does not object to the defendants' reporting dates being staggered so that they are not incarcerated concurrently, in order to allow one of them to be available, if necessary, to care for their son. Otherwise, their plea agreements explicitly prohibit any other delays in serving their sentences.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By: */s/ Ian J. Stearns*
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
STEPHEN E. FRANK
IAN J. STEARNS
Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                             */s/ Ian J. Stearns*
                                             IAN J. STEARNS
                                             Assistant United States Attorney